IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. C-1-02-107 |
| | ) | |
| **THE BOARD OF COUNTY COMMISSIONERS, HAMILTON COUNTY, OHIO, et al.**, | ) ) ) | Judge S. Arthur Spiegel |
| | ) | |
| Defendants. | ) | STATUS REPORT BY THE |
| _____ | ) | BOARD OF COUNTY COMMISSIONERS |
| | ) | OF HAMILTON COUNTY, OHIO AND |
| | ) | THE CITY OF CINCINNATI ON THE |
| **STATE OF OHIO**, | ) | WET WEATHER IMPROVEMENT |
| | ) | PROGRAM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **THE BOARD OF COUNTY COMMISSIONERS OF HAMILTON COUNTY, OHIO and THE CITY OF CINCINNATI**, | ) ) ) ) ) | |
| | **)** | |
| Defendants. | ) | |
| _____ | ) | |

  This Status Report is submitted by the Board of County Commissioners of Hamilton County, Ohio and the City of Cincinnati (collectively "Defendants"). It provides the Court with information on Metropolitan Sewer District of Greater Cincinnati ("MSD") Consent Decree activities and responds to Sierra Club's July 31, 2008 Status Report concerning Defendants' Wet Weather Improvement Program ("WWIP"). It also reports briefly on MSD's implementation of the Court's July 30, 2008 Order regarding Water In Basement cleanups.

– 1 –

As a preliminary matter, Defendants note their agreement with the Status Reports filed by the Regulators[1] on April 17, 2008 (detailing work conducted by Defendants since the Consent Decree was approved in 2004) and August 20, 2008. Defendants file this separate Status Report to provide the Court with additional details as to what has occurred since the parties entered the June 2004 Consent Decree and acknowledge implementation of the Court's WIB cleanup order.

1. <u>Water In Basement Update and Collaboration with Ombudsman</u>

Defendants are pleased to report to the Court that the Court's July 30, 2008 Order to offer basement cleanups where there has been a failure in the private property lateral in the right-of-way has been implemented by MSD.

MSD also confirms for the Court that the invoices for the Ombudsman are all current and that MSD has established a new, direct payment protocol with the Ombudsman to avoid delays.

Defendants provided a draft enhanced communication plan to the Ombudsman in July for her review and comments. Elements of this plan were discussed before the Court in the July 16, 2008 hearing. The submitted plan is ready for immediate implementation or initiation pending consideration of the Ombudsman's comments received this week. Defendants expect to continue to work collaboratively with the Ombudsman on these issues.

2. <u>Consent Decree Compliance/Environmental Improvement Activities</u>

The June 2006 WWIP provided a plan to undertake $1.99 billion in projects and program activities by 2029. The WWIP plan submitted in June 2006 complied with the Global Consent Decree and the requirements of the Clean Water Act and the National CSO Policy.

---

[1] The "Regulators" are plaintiffs United States Environmental Protection Agency, the Ohio Environmental Protection Agency and the Ohio River Valley Water Sanitation Commission (ORSANCO).

As summarized below, since the submission of the 2006 WWIP, the Defendants have engaged in extensive further investigation, analysis and discussion with the Regulators and other parties, including the Sierra Club. This extensive engagement has demanded innovative, cutting edge analysis by MSD, including studies that were first of their kind in the country. As the summary demonstrates, MSD efforts to revise the WWIP have been exhaustive and, Defendants believe, will result in the very near term in a high quality revised WWIP.

In the interim, MSD continues to plan, design and construct an extensive list of projects that have improved water quality in this area. There has been no delay in water quality improvement. The June 2006 WWIP anticipated that 104 separate projects would be active by July 2008. By July 2008, all 104 projects were active. In addition, 18 other projects were active that were not expected to be active until after June 2008. Of these 122 projects, MSD reports that one half (61) projects have been constructed. These projects include 23 projects expressly required by the Interim Consent Decree or the Global Consent Decree, with the balance being projects approved by the Regulators pursuant to the Consent Decree. To date, MSD has expended approximately $200 million on Consent Decree projects.

These Consent Decree activities have resulted in real water quality improvement. In terms of Combined Sewer Overflows, 20 projects that are complete or in final closeout have reduced overflow volume by 234.17 million gallons per year (MG/yr). Another 8 CSO projects in active construction are or will soon be reducing overflows by an additional 322.23 MG/yr. An additional 27 Consent Decree based projects that are active in planning will reduce overflows by more than a billion gallons per year (1,016.59 MG/yr).

With respect to Sanitary Sewer Overflows, 52 projects that MSD reports are complete (24 projects), in final closeout (18 projects) or in active construction (10 projects) have reduced or will reduce annual sanitary overflow events by an estimated 402 events. The annual estimated volume reduction of sanitary overflow attributable to these projects is 77.80 MG/yr. Another 14 SSO projects are active in planning, which will reduce an additional 10 annual SSO events and result in an annual volume of overflow reduction of an estimated 25 MG/yr. These projects when completed are estimated to result in an annual reduction of 91% of the total Sanitary Sewer Overflow volume in the MSD system.

These completed and active Consent Decree based projects are resulting in real water quality improvement today. When all of these projects are completed, they are estimated to have cost over $368 million.

3.  Actions Taken to Address Regulator and Sierra Club Requests, Inquiries, and Issues

    A.  Introduction

Since Defendants submitted the 2006 WWIP, the Regulators have required the Defendants to conduct multiple studies and issue written reports on significant potential alterations to their 2006 WWIP and have further required the Defendants to engage in numerous meetings and conference calls to discuss these and related issues. In addition, Defendants have spent significant time, especially in 2008, meeting with Sierra Club leadership to collaboratively evaluate the Regulators' requested alterations, focusing on WWIP project priorities, and discussing other subjects. The Defendants have been ready to prepare a revised WWIP for many months, yet believe that the time spent with the Regulators and Sierra Club has provided value.

B.      Details On Studies, Discussions, and Meetings with Regulators and Sierra Club

This section of the Status Report provides detailed background information, in general chronological order on the extensive 2006 – 2008 WWIP revision activities.

In June 2006, Defendants submitted their twenty-four volume 2006 WWIP to the Regulators, provided copies to the Sierra Club and others locally, and posted it on MSD's web-site (where it remains available today).  During the second half of 2006, the Regulators contacted Defendants for follow-up and explanatory information as they were conducting their review of the WWIP.  In late August 2006, U.S. EPA asked questions regarding MSD's financial capability text and conclusions in the WWIP and MSD responded in early October.  On November 7, 2006, U.S. EPA (on behalf of the Regulators) wrote MSD (on behalf of the Defendants) to inform them that the Regulators' review of the WWIP would take longer than sixty days. In early November, the Regulators and Defendants discussed issues arising from the WWIP.

In fact, the Regulators' initial review continued during 2006 and culminated in a February 2007 meeting at MSD between more than 30 representatives of the Regulators and Defendants.  At that meeting, the Regulators indicated that they desired that the 2006 WWIP be enhanced by consideration of an aggressive commitment to the use of so-called "Green Infrastructure" across the entire County and especially in the Lower Mill Creek, the possible use of certain alternative treatment technologies in certain locations, and by the possible construction of a "short tunnel" running from approximately Mitchell Avenue southward and paralleling the Mill Creek down to near the Ohio River.  The latter two concepts were collectively dubbed by the Regulators as the "Strawman" concept because it required additional studies to understand its actual size, costs, and implications.  The Regulators requested that the Defendants conduct studies of the multiple ideas

raised in the meeting, including costs, feasibility, scheduling, and related matters, so that the Regulators (and Defendants) could further evaluate the practicability of those ideas. The Regulators also raised additional questions on financial capability issues for Defendants to review and address after the meeting. Defendants understand that the Regulators obtained input from the Sierra Club before, and briefed Sierra Club after, this meeting.

The Defendants moved ahead on all of the issues and requests raised by the Regulators. The "Strawman" evaluative process required significant engineering evaluations in order to take the proposed concepts and translate them into more detailed information for even preliminary consideration. In March, 2007, Defendants held a Technical Meeting with the Regulators to discuss the ideas raised by the Regulators in February in greater detail. MSD was asked to continue its detailed evaluation of "Strawman" concept ideas, activities and costs for the Regulators.

In early May 2007, MSD hosted a Technical Meeting among Regulators and Defendants to further discuss and evaluate the "Strawman" submissions, alternative technologies, preliminary Green Infrastructure evaluative work conducted by Defendants, and other matters. One additional key issue that was discussed was MSD's request to proceed with important Consent Decree projects during the period of the Regulators' review of the 2006 WWIP and possible enhancements to it. The Regulators acknowledged that such project work was important, but asked MSD to provide substantial additional detail before approving MSD's request to proceed. MSD provided that information and the Regulators ultimately indicated approval to proceed with these Consent Decree based projects. U.S. EPA, on behalf of the Regulators, followed up the early May meeting with a detailed letter on matters raised during the meeting to MSD (on behalf of the Defendants). It is our understanding that the Regulators discussed the meeting and its subjects with Sierra Club.

On May 23, 2007, MSD hosted a meeting between representatives of the Regulators and Defendants. The meeting included detailed discussions on "Strawman" costs, financial capability considerations, follow-up technical discussions about the use of alternative treatment technologies and Green Infrastructure. The meeting resulted in a list of 25 report deliverables or information inquiries by the Regulators to which MSD was required to respond by specific dates in June and July 2007. Some of these deliverables required substantial additional studies and research. MSD, on behalf of Defendants, timely submitted all of the report deliverables and information as requested by the Regulators. It is our understanding that the Regulators discussed the meeting and its subjects with Sierra Club.

In early June 2007, MSD received additional information requests from the Regulators about specific alternative treatment technology options and promptly began the technical and financial work to evaluate and cost those options and provide a response to the Regulators. One of these Regulator requests resulted in a review of previous pilot studies of one alternative treatment technology. MSD conducted the review and submitted information to the Regulators.

In late June 2007, representatives of the Regulators and Defendants held a conference call with their respective financial experts to evaluate in detail financial capability information impacting possible changes to the 2006 WWIP, in part to address the Regulators' "Strawman" concept. The Regulators asked the Defendants for substantial additional and updated financial information on local economic conditions, the MSD Service Area and localities within it, and other matters.

In early July 2007, the Regulators asked the Defendants to prepare a report on their investigations into the potential use of Green Infrastructure as proposed by the Regulators. In late July, MSD submitted a *"Green Infrastructure Report"* to the Regulators, provided a copy to Sierra

Club and local officials, and MSD posted the large report on its web site (where it remains available today). The Report identified a conceptual plan to create a comprehensive, large-scale *"Green Infrastructure Program"* which would have as its purpose a significant reduction in storm water discharges to MSD's combined and sanitary (separate) sewers. The Defendants indicated in this Report that they were willing to pursue the concepts for changes in both WWIP activities as well as local ordinances, regulations, and practices, and asked for the Regulators to indicate if the many technical and legal ideas raised in the report should be pursued. In September, the Regulators indicated that they desired that the Defendants further investigate these concepts, requesting extensive additional study (see more below).

Among the Green Infrastructure Report's 22 exhibits was a focused study of part of the Lick Run watershed to evaluate the potential results from the use of Green Infrastructure in this area. The study was entitled *"Low Impact Development Assessment for Lick Run"*. Because Green Infrastructure has not been used locally in significant projects, and because the Regulators desired information to evaluate these issues both locally and nationally, the Defendants agreed with the Regulators' request for this study and report. Another exhibit was information on a pioneering study which U.S. EPA was conducting (and continues to) in Cincinnati to evaluate the social and economic feasibility of Green Infrastructure. Defendants have been encouraged to communicate and work with U.S. EPA's research and development staff to share information that each are developing on the uses of Green Infrastructure. Sierra Club has been made aware of this study and the ongoing contacts with U.S. EPA.

In August 2007, the Defendants provided to the Regulators an updated version of the Lick Run study of low impact development report (noted above). The report included additional study

results. Sierra Club was provided a copy of this report.

In early September 2007, representatives of the Regulators and Defendants held an extended conference call to discuss the Regulators' review of Green Infrastructure and other technical reports, information, and issues. The Regulators, as noted above, had proposed in early 2007 that MSD consider a comprehensive Green Infrastructure program enhancement to the 2006 WWIP. After review of MSD's Green Infrastructure proposal, the Regulators asked the Defendants to conduct a detailed study to evaluate how MSD might integrate Green Infrastructure into its existing WWIP projects (the *"Green/Grey Study"*) and what costs and benefits might arise from this integration. Because such a study was not known by the Regulators (or Defendants) to have been previously conducted anywhere in the United States, the parties understood that this study would have national implications as well as potential local application. The Regulators provided substantial detail during this call regarding the types of inputs they wanted considered and the types of deliverables to be produced by Defendants. We understand that Sierra Club was informed of the Regulators' views and requests for additional, detailed study.

In October 2007, the Regulators and Defendants met together with their respective economic experts to evaluate extensive revised financial capability information that Defendants had prepared at the request of the Regulators. The Regulators requested additional, follow-up information from the meeting, including information on the local effects of the foreclosure crises, which was provided to the Regulators. Meanwhile, Defendants continued work on the significant *Green/Grey Study* requested by the Regulators.

In November 2007, the Defendants spent substantial time on the *Green/Grey Study*, while they also obtained and reported to the Regulators on financial information requested by the

Regulators. Representatives of Sierra Club, MSD and County met on November 29, 2007 to discuss multiple WWIP issues.

In December 2007, the Defendants completed and in early January 2008, submitted to the Regulators their sizable *Green/Grey Study*, which included detailed evaluations of the potential impacts of integrating Green Infrastructure into the otherwise "grey" WWIP. Copies of the Study report were provided to both Regulators and Sierra Club.

In January 2008, the Defendants conferred with the Regulators to explain details of the *Green/Grey Study* and its report and how to use the many maps, charts, and tables to understand the environmental and financial projections in the report. The Regulators and Defendants began discussions about the preparation of a detailed outline of a revised WWIP which would include lists of WWIP projects, enhancements requested by the Regulators, revised financial capability information, and schedules.

In February 2008, the Regulators asked Defendants detailed questions about the *Green/Grey Study* report and identified areas where additional study and analysis might be beneficial. The Regulators also asked questions about Defendant's "asset management" (ongoing replacement and repairs to treatment and collection systems), ideas, plans, and budgets. The Regulators also indicated that they were receiving inquiries from Sierra Club about the *Green/Grey Study* report and other issues. The Defendants indicated that discussions with Sierra Club on the *Green/Grey Study* and other matters had occurred and more discussions were expected in the future. The Defendants provided the Regulators with supplemental technical and financial information as requested by the Regulators.

In March 2008, the Defendants provided additional financial information at the request of the Regulators. Copies of these financial "scenario" documents were also provided to Sierra Club. These documents identified rate increases that could be required to fund an increased WWIP program size under current and more difficult economic conditions. In March 2008, Sierra Club representatives met with representatives of MSD and County on March 7, 17 and 31 to discuss these and multiple other issues. The Defendants and Regulators continued discussions about technical and financial issues that needed resolution in order for an outline of a revised WWIP to be submitted by the Defendants to the Regulators. The Regulators asked for additional information on the benefits that could be derived from the use of Green Infrastructure, focused especially in the Lower Mill Creek area. MSD began work on a new study on this issue.

In April 2008, the Regulators asked the Defendants if they would meet with Sierra Club to obtain Sierra Club's comments on possible reprioritization of WWIP projects in light of the Regulators' and Defendants' discussions about using "project bundles" and a re-evaluation of the ranking of projects in the 2006 WWIP. The Defendants agreed to continue their ongoing meetings with Sierra Club, but proposed to increase the frequency of those meetings. The Defendants completed the requested supplemental studies into Green Infrastructure applicability in the Lower Mill Creek and provided a report to the Regulators. A copy of this report was provided to the Sierra Club. On April 22, representatives of the Regulators, Defendants and Sierra Club held a joint telephone conference in order for MSD and its consultants to explain the results of the most recent Green Infrastructure applicability study and answer questions. Other issues discussed during this conference call included asset management, WWIP program costs, schedules, financial capability issues, and prioritization of WWIP projects. The Defendants also prepared for a mid-April Status

Conference before the Court which was ultimately postponed. The Regulators filed a detailed Status Report with the Court which outlined Consent Decree related activities since June 2006.

In May 2008, representatives of the County and Sierra Club traveled to Washington, D.C. to meet with members of the Ohio Congressional delegation and senior U.S. EPA officials to explain why they were advocating the use of Green Infrastructure as part of MSD plans to improve water quality. Representatives of Sierra Club and the Defendants met to discuss Sierra Club inquiries and to jointly begin work evaluating the "Consent Decree project bundles". Sierra Club was invited to participate in MSD's Green Strategies Advisory Group. Defendants submitted to the Regulators a lengthy "MSDGC Asset Management Review" white paper prepared by its Consent Decree Program management consultant ("PMC") to answer questions raised by the Regulators. A copy was also provided to Sierra Club.

At the request of the Regulators, on May 21, 2008, MSD submitted to Sierra Club for comment a draft letter from MSD to the U.S. EPA describing a process and schedule for (a) submitting a detailed outline of a revised WWIP, and (b) Sierra Club to be given time during the Summer of 2008 to meet regularly with Defendants to provide input into the WWIP project reprioritization process, leading to a revised WWIP submission. As noted below, Defendants met almost weekly with Sierra Club on the issues outlined in the May 21, 2008 letter and other issues. The Defendants subsequently asked Sierra Club several times for specific changes to the May 21, 2008 letter and the process described therein, so that the letter could be finalized and sent to U.S. EPA, but Defendants have yet to receive edits to that draft letter. Nonetheless, meetings with Sierra Club continued.

In June 2008, Sierra Club representatives met with the Director of MSD, the County Compliance Coordinator, and the head of the PMC on June 2, June 11, and June 25 to discuss multiple issues, including finances, WWIP project reprioritization, the potential Pleasant Run Waste Water Treatment Plant, Green Infrastructure demonstration and pilot projects, and asset management. Minutes of these meetings have been provided to Sierra Club and are available to the Court and Regulators. A new draft WWIP project/bundle prioritization rating matrix was prepared by the PMC and shared with Sierra Club and Defendant representatives for their comment and revisions.

In July 2008, Sierra Club representatives met with the Director of MSD, the County Compliance Coordinator, and the head of the PMC on July 2, July 11, July 17, July 24, and July 30 to discuss multiple issues, including Green Infrastructure, possible additions or deletions to a new list of Tier 1 and Tier 2 projects to be included in a revised WWIP, and significant work refining the new draft WWIP project/bundle prioritization rating matrix. Minutes of these meetings have been provided to Sierra Club and are available to the Court and Regulators. Discussions were held regarding waiting for various criteria, scoring methods, the meaning of certain criteria terms, and related matters. The Asset Management white paper (discussed above in the paragraph regarding May 2008) was discussed. Discussions were also held with Sierra Club on a proposed set of so-called "Allowance activities" (Water in Basement program, Trenchless Technology, Home Sewage Treatment System elimination, etc.) which were in the 2006 WWIP but could be revised in the upcoming WWIP revision to be submitted by Defendants to the Regulators. Sierra Club filed its Status Report on July 31, 2008.

In August 2008, Sierra Club representatives met with the Director of MSD, the County Compliance Coordinator, and the head of the PMC on August 13 to discuss multiple issues, including finalizing the WWIP project/bundle reprioritization into Tier 1 and Tier 2 lists based upon the scoring which CDM performed using the multi-criteria scoring matrix. This group is scheduled to meet again on August 27, 2008.

### C. Summary

The Defendants trust that this summary of events during the past two-plus years answers the exhaustive process inherent in revising, finalizing and approving the WWIP. The Defendants have striven to cooperate and respond to all of the many requests they have received from the Regulators (as well as Sierra Club and others) during this time period. Several of the key studies Defendants have conducted at the request of the Regulators, most especially those on Green Infrastructure, the integration of Green/Gray components into a WWIP, and the potential effectiveness of Green/Gray integration on the reduction of combined sewer overflows appear to have been the first of their kind in the nation. These efforts will provide substantial, useful information for the final WWIP as well as providing models to be used in other communities in the Nation.

The Defendants also trust that this summary indicates that they have communicated regularly with the Regulators and Sierra Club. Further, when asked, the Defendants have been very willing to devote extraordinary time by senior management to meet with Sierra Club on an intensive schedule (almost weekly for two months, plus other meetings) to obtain Sierra Club's input and use it in the Defendants' WWIP revisions.

      4.      <u>Schedule to Complete the Revised WWIP and obtain Regulators' Approval</u>

Defendants share the frustration of Sierra Club and the Regulators about this two plus year period of additional study, investigation, reports, meetings, information-sharing, and communication. While MSD has done substantial work in planning and projects to comply with the Consent Decree and improve water quality during this period, the Defendants also believe it is time to revise the WWIP for approval by the Regulators.

In that regard, the Regulators have informed the Defendants that they want a detailed set of technical and financial documents outlining the contents of the revised WWIP by mid-September 2008. While it will take substantial work by their respective leaderships and the staff of MSD, the Defendants have accepted this deadline.

Earlier in 2008, the parties, along with the Sierra Club, sought to work out a schedule to complete this process. In May 2008, MSD circulated a draft letter with a proposed schedule. While the Regulators found the draft acceptable, Sierra Club never provided any edits to the letter. Thereafter, and as noted above, a series of working sessions with Sierra Club were then held during the summer of 2008. Substantial parts of the detailed outline and technical information that Defendants will provide by September 12, 2008 have been discussed in the past several months with Sierra Club leadership, especially Consent Decree projects and their prioritization. Defendants valued Sierra Club's input. Defendants hope that this time invested in obtaining Sierra Club's input and ideas will be viewed as time well spent and expect that it will result in a high quality revised WWIP.

5. <u>Conclusion</u>

The parties to the Consent Decree, and the Sierra Club, have communicated frequently and worked cooperatively and responsively throughout the period since the draft WWIP was submitted in June 2006. MSD has constructed Consent Decree projects, improved water quality, and has many other projects in planning and design stages, with the written approval of the Regulators and the knowledge of the Sierra Club. The Defendants have provided and continue to provide information to, and seek input from, Sierra Club.

Accordingly, the Defendants respectfully request that the Court deny the relief sought by Sierra Club in its most recent Status Report and, instead enter the schedule Order proffered by the Regulators. Doing so will result in the preparation and review of a detailed outline plan for the Revised WWIP, additional input from Sierra Club, appropriate review and comments by Regulators, focused toward submission and approval of the final Revised WWIP. Defendants look forward to this process moving promptly to that result.

Respectfully submitted,

s/ Mark A. Norman
Mark A. Norman (0012033)
Vorys, Sater, Seymour and Pease LLP
221 E. 4th Street, Suite 2000, Atrium Two
Cincinnati, Ohio 45202
Telephone: (513) 723-4006
Facsimile: (513) 852-7881
manorman@vorys.com

Attorneys for Board of County
Commissioners, Hamilton County, Ohio

s/ Louis L. McMahon
Louis L. McMahon (0067378)
Thompson Hine LLP
3900 Key Center, 127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 566-5500
Facsimile: (216) 566-5800
Louis.McMahon@ThompsonHine.com

Attorneys for City of Cincinnati, Ohio

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2008, a true and accurate copy of the foregoing was filed electronically with the Court's CM/ECF system, which will send notification to all registered to receive such service. Parties may access this filing through the Court's electronic filing system.

<pre>
                                        s/ Mark A. Norman
                                        Attorneys for Board of County
                                        Commissioners, Hamilton County, Ohio
</pre>